RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0024p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DANNY HILL,

*Petitioner-Appellant,*

*v.*

CARL ANDERSON, Warden,

*Respondent-Appellee.*

Nos. 99-4317/14-3718

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:96-cv-00795—Paul R. Matia, District Judge.

Argued: November 30, 2016

Decided and Filed: February 2, 2018

Before: MERRITT, MOORE, and CLAY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Vicki Ruth Adams Werneke, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Peter T. Reed, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Vicki Ruth Adams Werneke, Lori B. Riga, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Peter T. Reed, Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

MERRITT, Circuit Judge. In this death penalty case out of Ohio, Danny Hill asserts in his habeas petition that he may not be executed because he is "intellectually disabled," as now

defined in three Supreme Court cases decided in the past fifteen years.[1]  *Atkins v. Virginia*, 536 U.S. 304 (2002), was decided and made retroactive after Hill was convicted of murder and sentenced to death, so although Hill raised his intellectual disability as a mitigating factor in the penalty phase of his trial, he was not afforded the constitutional protections set forth in *Atkins* during his original trial.  Our court issued a remand order in 2002 directing the State of Ohio to assess Hill's intellectual functioning in light of *Atkins*.  *Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002).  The issue now before us is whether that assessment comports with *Atkins* and the Supreme Court's later opinions on the subject.  We conclude that the courts in Ohio have unreasonably applied the Supreme Court's three-part standard in this case.

In its three cases on the subject of executing the intellectually disabled, the Supreme Court relies on two diagnostic manuals of the psychiatric profession to determine whether a defendant has an "intellectual disability"—*Intellectual Disability: Definition, Classification, and Systems of Supports*, the diagnostic manual published by the American Association on Intellectual and Developmental Disabilities, and the *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association.[2]  Both manuals require three separate findings before a diagnosis of intellectual disability is appropriate:  (1) the individual exhibits significant deficits in intellectual functioning—indicated by an IQ score "approximately two standard deviations or more below the mean," or roughly 70; (2) the individual exhibits significant adaptive skill deficits—such as "the inability to learn basic skills and adjust behavior to changing circumstances"—in certain specified skill sets; and (3) the deficits arose while the individual was still a minor.  *See Moore v. Texas*, 137 S. Ct. 1039, 1045 (2017); *Hall v. Florida*, 134 S. Ct. 1986, 1994-95 (2014); *Atkins*, 536 U.S. at 308 n.3.

The Ohio courts and the parties agree that Hill's IQ is so low (ranging from a low of 48 to a high of 71) that he easily meets the first element of the clinical definition of intellectual disability.  They disagree, however, on the propriety of the state courts' holdings that Hill did not

---

[1]We will use the medical community's preferred term of "intellectually disabled" in place of "mentally retarded" except where the term is in quoted material.

[2]Prior to 2007, the American Association on Intellectual and Developmental Disabilities (AAIDD) was known as the American Association on Mental Retardation (AAMR).

exhibit sufficient adaptive deficits under the second element and that Hill's deficits did not manifest themselves before Hill reached the age of 18. Therefore, we must resolve the dispute between the parties as to these two elements.

On the question of "adaptive deficits," we conclude that the Ohio courts have made the same basic mistake as the Texas courts in the recent case of *Moore v. Texas*, in which the Supreme Court reversed the death penalty because the Texas court incorrectly ruled that the prisoner's "adaptive strengths . . . constituted evidence adequate to overcome the considerable objective evidence of Moore's adaptive deficits." 137 S. Ct. at 1050. The Supreme Court rejected that view, noting that "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Id.* (emphasis in original) (citing AAIDD-11, at 47 (2010); DSM-5, at 33, 38 (2013)).[3] That view is consistent with the Court's previous observation that "intellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2281 (2015) (quoting AAMR-10, at 8 (2002)). The case supporting a finding that Hill is intellectually disabled is even stronger than in *Moore*. Whereas Moore's intellectual functioning based on IQ was debatable, Hill's IQ is so low that the Warden concedes that Hill satisfies the first element of the definition.

We recognize that *Moore* was decided after the Ohio Court of Appeals rejected Hill's *Atkins* claim in 2008. *See State v. Hill,* 894 N.E.2d 108, 127 (Ohio Ct. App. 2008). Ordinarily, Supreme Court decisions that post-date a state court's determination cannot be "clearly established law" for the purposes of AEDPA. *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012) (Under AEDPA, the "law in question must have been clearly established at the time the state-court decision became final, not after."). However, as discussed in more detail below, we find that *Moore's* holding regarding adaptive strengths is merely an application of what was clearly established by *Atkins*.

In light of the Ohio Court of Appeals' unreasonable determinations under both the adaptive-skills and age-of-onset prongs of the *Atkins* standard, we **REVERSE** the judgment of

---

[3]We will refer to the diagnostic manuals as "AAMR" or "AAIDD," and "DSM" followed by a number identifying the referenced edition.

the district court and **REMAND** the case with instructions to grant the petition and to issue the writ of habeas corpus with respect to Hill's death sentence.

In addition to his *Atkins* claim, Hill raises an ineffective assistance of counsel claim that attacks his trial counsel's performance during his state *Atkins* hearing, a *Miranda* claim arguing that certain statements should have been suppressed during his trial, a prosecutorial misconduct claim, and a due process claim arguing that Hill was not competent to stand trial at the time of his convictions. For the reasons set forth below, we **AFFIRM** the district court's judgment denying Hill's habeas petition with regard to the latter three claims, and pretermit the ineffective assistance of counsel claim regarding *Atkins* because we are granting relief on the merits of the *Atkins* claim.

## I.  Background

The facts and legal proceedings surrounding Hill's conviction and death sentence in 1986 are set out in our earlier opinion. *See Hill*, 300 F.3d at 681. Because this case centers on the issue of intellectual disability, what follows is an account of the facts and proceedings relevant to that question in this case.

Several evaluations conducted around the time of Hill's trial in 1986 reveal that Hill "has a diminished mental capacity," a fact acknowledged by the state court after Hill's *Atkins* hearing. *See Hill*, 894 N.E.2d at 112 (summarizing the testimonies of the three experts who testified during the mitigation phase of the initial trial that Hill was "mentally retarded"). Hill's IQ at the time of trial ranged from 55 to 68, and his moral development was "primitive"—essentially that of a two-year old. *Id*.

Hill has also demonstrated an "inability to learn basic skills and adjust [his] behavior to changing circumstances" since a very young age. *Hall*, 134 S. Ct. at 1994. Since his earliest days in school, Hill has struggled with academics. At the age of six, a school psychologist noted that Hill was "a slow learning child" and recommended that his teachers "make his work as concrete as possible" without "talking about abstract ideas." Warren Cty. School Psychologist's Report, dated Mar. 20, 1973. After kindergarten, Hill was placed into special education classes for the remainder of his time in the public school system. Hill struggled to keep up academically

even in his special education classes and had difficulty remembering even the simplest of instructions. At the age of 15, Hill could barely read or write. Those problems persist today. Indeed, prison records and testimony of prison guards indicate that the prison staff believed Hill to be illiterate, that he could not remember the balance on his commissary account and would often spend more money than was in his account, and that he could not perform even the most basic cleaning tasks without close supervision.[4] *See* Supp. *Atkins* App'x at 1325, 1483-86, 1510-12, 1553, 1784.[5]

Hill has also been unable to take care of his hygiene independently from a young age. Hill's school psychologist recalled that, even as a kindergartener, Hill "had a problem with body odor and did not wear clean clothes to school." Decl. of Karen Weiselberg-Ross, Warren Cty. School Psychologist ¶¶ 4, 12. During his time in a home for children with behavioral issues, Hill could not remember to comb his hair, brush his teeth, or take a shower without daily reminders. Mitigation Hr'g Tr. at 88, No. 85-cr-317 (Ohio Ct. of Common Pleas Feb. 26, 2986).[6] Even in the highly structured environment of death row, Hill would not shower without reminders.

The Supreme Court decided *Atkins* in 2002 while Hill's appeal from the district court's denial of his habeas petition was pending before this court. We remanded the case to the district court with instructions to remand Hill's unexhausted *Atkins* claim to the state court and to stay the remaining claims pending resolution of the *Atkins* claim. *Hill*, 300 F.3d at 683. After the case was returned to the state court, three experts—Drs. David Hammer, J. Gregory Olley, and

---

[4]Some prison guards and officials testified in court or during interviews conducted by the experts that Hill properly accounted for the funds in his commissary account and filled out his own commissary forms, had no noticeable difficulties maintaining proper hygiene, and was of average abilities relative to his fellow death-row inmates. However, as will be discussed further below, both the Supreme Court and clinical guidelines "caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Moore*, 137 S. Ct. at 1050. Thus, while we do not ignore evidence in the record of Hill's seemingly improved adaptive functioning once he entered the highly regimented environment of death row, we find error in the state courts' overly emphasizing such evidence without also considering the contradictory evidence highlighted above and without acknowledging the diagnostic limitations associated with evaluating "improved behavior in prison." *See id.*

[5]The Supplemental *Atkins* Appendix can be found in the district court record at R. 97 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Apr. 30, 2010).

[6]The Mitigation Hearing Transcript can be found in the district court record at R. 31 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28, 1997).

Nancy Huntsman—examined Hill and testified over the course of several evidentiary hearings on Hill's *Atkins* claim.[7] Dr. Hammer was retained by Hill, Dr. Olley acted as the state's expert, and Dr. Huntsman was appointed by the trial court. Dr. Hammer concluded that Hill met all three prongs for a diagnosis of intellectual disability. However, Drs. Olley and Huntsman concluded that Hill was not intellectually disabled. After considering the evidence presented on Hill's claim of intellectual disability, the state trial court denied Hill's petition for relief under *Atkins*, finding that Hill did not exhibit significant adaptive deficits and that any deficits he did have did not manifest before the age of 18. *State v. Hill*, No. 85-CR-317 (Ohio Ct. of Common Pleas Feb. 15, 2006) (unreported). The Ohio Court of Appeals affirmed the trial court over a dissent. *State v. Hill*, 894 N.E.2d 108 (Ohio Ct. App. 2008). The Ohio Supreme Court declined to review the case, with two justices dissenting. *State v. Hill*, 912 N.E.2d 107 (Ohio 2009) (table).

Hill then moved to reopen and amend his habeas petition in this case to include claims under *Atkins*. The district court denied Hill's amended petition in a thorough opinion, holding that the deferential standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) mandated denial of Hill's habeas petition. *Hill v. Anderson*, No. 4:96-cv-00795, 2014 WL 2890416, at *51 (N.D. Ohio June 25, 2014). The district court denied Hill's petition despite its serious misgivings about the state court's rejection of the extensive record evidence that provided important diagnostic information regarding Hill's adaptive functioning and the age of onset of Hill's intellectual disability. *Id*. Ultimately, the district court believed AEDPA required acceptance of the state court's determinations that Hill did not exhibit sufficient adaptive deficits and that Hill's disability did not manifest before the age of 18.

The district court was right to be skeptical of the state court judgment because it amounted to an unreasonable application of the standard articulated by the Supreme Court in *Atkins* and as later explained by *Hall* and *Moore*. Specifically, the state court's determination was unreasonable in two ways: First, the state court departed from the requirements of *Atkins*

---

[7]As part of his *Atkins* evaluation, Hill was administered recognized standard tests measuring adaptive behavior by the three experts. The tests took place in a prison conference room. All three experts determined that the results of these tests were not reliable because Hill was "faking" the answers and in some instances did not complete the tests, instead breaking down in tears and claiming the tests were "too hard." As these tests were deemed unreliable, the experts were forced to base their assessments on their interactions with Hill and on interviews with prison guards. *See Hill*, 894 N.E.2d at 113.

when it disregarded well-established clinical standards for assessing adaptive deficits by focusing on Hill's adaptive strengths instead of his adaptive deficits. Second, the trial court ignored clear and convincing evidence that Hill exhibited substantial deficits in both his intellectual and adaptive abilities since long before he turned 18.

## II. Standard of Review

The parties dispute the proper standard of review for Hill's *Atkins* claims. Hill argues that we should review the state courts' determinations on adaptive deficits and age of onset as legal conclusions under 28 U.S.C. § 2554(d)(1), which would have us ask whether those decisions amount to an unreasonable application of the Supreme Court's precedents in *Atkins* and its progeny. The Warden argues that we should instead review those determinations as findings of fact under 28 U.S.C. § 2254(d)(2), which would require us to accept the state court's findings absent "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1).

We agree with Hill that the state courts' determination on adaptive deficits should be analyzed as a legal conclusion under 28 U.S.C. § 2254(d)(1) because it is merely the result of an application of the standard articulated by the Supreme Court in *Atkins* and its progeny to the facts as found by the trial court. *See Van Tran v. Colson*, 764 F.3d 594, 626-27 (6th Cir. 2014) (holding that the "state court's application of Tennessee law with regard to whether [the defendant] is intellectually disabled under *Atkins* was contrary to clearly established federal law"); *Black v. Bell*, 664 F.3d 81, 100 (6th Cir. 2011) ("The rules governing what factors may be considered in determining whether a defendant qualifies as mentally retarded under *Atkins* deal with questions of law."); *Murphy v. Ohio*, 551 F.3d 485, 510 (6th Cir. 2009) (reviewing state courts' resolution of *Atkins* claim under 28 U.S.C. § 2554(d)(1)). As a result, our review under AEDPA consists of determining whether the state courts' conclusion that Hill did not exhibit deficits in two or more adaptive skill sets was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court judgment is the result of an unreasonable application of clearly established law for AEDPA purposes when the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 408-09 (2000).

However, we agree with the Warden that the state court's conclusion on the age of onset is better analyzed as a finding of fact under 28 U.S.C. § 2254(d)(2) as it is based entirely on an assessment of the evidence presented during Hill's evidentiary hearing. Accordingly, our review is limited to the question of whether the state court's finding that Hill's intellectual and adaptive deficits did not manifest before the age of 18 amounts to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In making that assessment, we are mindful that AEDPA directs us to presume that facts decided by the state court are correct absent "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1).

## III. Adaptive Deficits

Hill first disputes the Ohio court's finding that he did not exhibit "subaverage adaptive skills," reasoning that the state court's finding amounted to an unreasonable application of *Atkins* because the court's analysis on that point disregarded established medical practice. We agree and find that Hill has deficits in at least two adaptive skillsets under *Atkins*.

### A. Standard for Assessing Adaptive Deficits

In *Atkins v. Virginia*, the Supreme Court held that the Eighth Amendment prohibits the execution of intellectually disabled individuals after identifying a "national consensus" against the practice from a survey of state legislation exempting the intellectually disabled from the death penalty. 536 U.S. at 314-17. The Court defined "mental retardation" by reference to two clinical definitions of the phrase: one from the American Association on Mental Retardation's *Mental Retardation: Definition, Classification, and Systems of Supports* (9th ed. 1992), and a second from the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000). *Id*. at 308 n.3. Both definitions consisted of three independent elements: (1) significantly subaverage intellectual functioning, (2) significant limitations in adaptive functions, and (3) the first two elements manifested themselves before the age of 18. *Id.*

Since *Atkins*, the Supreme Court has twice reaffirmed the centrality of clinical standards to the judicial inquiry regarding a defendant's eligibility for the death penalty. *Moore*, 137 S. Ct.

at 1048-49; *Hall*, 135 S. Ct. at 2000. While it is true that the states retain some discretion to "develop[] appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," *Atkins*, 536 U.S. at 317 (internal quotation and citation omitted), the Court has been clear that the states' discretion on that count is not "unfettered." *Moore*, 137 S. Ct. at 1048, 1052-53 (quoting *Hall*, 134 S. Ct. at 1998). Specifically, states' determinations on the question of whether an individual is intellectually disabled "must be 'informed by the medical community's diagnostic framework.'" *Id.* at 1048 (quoting *Hall*, 134 S. Ct. at 2000). When a court "disregards established medical practice" in assessing a criminal defendant's claim of intellectual disability, the error amounts to an unreasonable application of clearly established federal law. *Hall*, 134 S. Ct. at 1995, 2001; *see also Moore*, 137 S. Ct. at 1053.

*Moore v. Texas* clarified the "prevailing clinical standards" for assessing whether a criminal defendant possesses sufficient adaptive deficits to be constitutionally ineligible for execution. *Moore*, 137 S. Ct. at 1050-52. In *Moore*, the Texas Criminal Court of Appeals concluded that the prisoner did not exhibit sufficient adaptive deficits because he had previously "lived on the streets, mowed lawns, and played pool for money." *Id.* at 1050. The Court rejected that approach and admonished courts not to "overemphasize[] [the defendant's] perceived adaptive strengths." *Id.* Instead, courts should follow "prevailing clinical standards," which "focus[] the adaptive-functioning inquiry on adaptive *deficits*." *Id.* (emphasis in original) (citing AAIDD-11, at 47 (2010) and DSM-5, at 33, 38 (2013)). The Supreme Court further noted "even if clinicians would consider adaptive strengths alongside adaptive weaknesses within the same adaptive-skill domain, neither Texas nor the dissent identifies any clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths in which the [Texas Court of Criminal Appeals] engaged." *Id.* at 1050 n.8. The Supreme Court also cautioned against "reliance on adaptive strengths developed 'in a controlled setting,' [like] prison" and pointed to clinical guidelines advising that strengths observed in prison should be compared to similar skills in general society whenever possible. *Id.* (citing DSM-5, at 38 (2013)).

Although they were decided after the state court decisions in this case, the primary holdings in *Hall* and *Moore* were compelled by *Atkins*. Both are illustrations of what was

previously established by *Atkins*.  *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000) ("'[C]learly established federal law as determined by the Supreme Court of the United States' means that the rule sought by petitioner must have been dictated or compelled by [existing precedent].'").

*Atkins* itself looked to the consensus of the medical community as reflected in medical texts and treatises to define "intellectual disability."  536 U.S. at 308 n.3.  In coming to its conclusion that the focus of the adaptive-functioning inquiry should be on adaptive deficits and not strengths, the Supreme Court in *Moore* looked to the medical texts available to it, including the American Association on Intellectual and Developmental Disabilities (11th ed. 2010), and a second from the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).  *Moore*, 137 S. Ct. at 1045.  Neither of these editions cited by the Court would have been available at the time of Hill's *Atkins* hearing.  However, the medical literature available in 2008 also required that the focus be on adaptive deficits rather than adaptive strengths.  For example, the American Association on Mental Retardation defined "mental retardation" and then provided four assumptions "essential to the application of the definition," including that "[s]pecific adaptive limitations often coexist with strengths in other adaptive skills or other personal capabilities."  AAMR-9 (1992).  As mentioned above, this source was cited by the Supreme Court in *Atkins* in order to define intellectual disability.  536 U.S. at 308 n.3.  Additionally, a later edition of the American Association on Mental Retardation's manual says that intellectually disabled persons may have "strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation."  AAMR-10, at 8 (2002).

Consequently, the Ohio Court of Appeals was required by *Atkins* and the medical literature available to it in 2008 to assess whether Hill had adaptive skill deficits in two or more categories, and not to focus on Hill's adaptive strengths.  Our use of *Moore* and *Hall* is limited to comply with AEDPA, but our conclusion regarding what *Atkins* clearly established is buttressed by the Court's reasoning in *Hall* and *Moore*.  In *Hall*, for instance, the Court stated that it "reads *Atkins* to provide substantial guidance on the definition of intellectual disability," 134 S. Ct. at 1999, and the Court determined that Florida had "misconstrue[d] the Court's statements in

*Atkins*" in refusing to allow defendants to present evidence of intellectual disability if their IQ scores exceeded 70. *Id.* at 2001. And in *Moore*, the Court described the Texas Court of Criminal Appeals' "conclusion" that the defendant was not intellectually disabled as "irreconcilable with *Hall*." 137 S. Ct. at 1049. Such statements indicate that *Atkins* dictated the holding in *Hall*, and *Hall*, in turn, dictated the holding in *Moore*.

In addition, the *Moore* Court described a 2015 case—*Brumfield v. Cain*, 135 S. Ct. 2269 (2015)—as "relying on *Hall* to find unreasonable a state court's conclusion that a score of 75 precluded an intellectual-disability finding." 137 S. Ct. at 1049. Because *Brumfield* reached the Supreme Court on collateral review and the state post-conviction rulings on the defendant's *Atkins* claims preceded *Hall*, the Supreme Court's reliance on *Hall* in *Brumfield* makes clear that *Hall*'s principal holdings were compelled by *Atkins*. Finally, a recent decision by our court discussed *Hall* and *Moore* in reviewing a district court's denial of an *Atkins* claim, even though the district court's decision predated *Hall* and *Moore*. *Black v. Carpenter*, 866 F.3d 734, 744 (6th Cir. 2017). *Black* therefore corroborates this panel's conclusion that the holdings of *Moore* and *Hall* were required by *Atkins*.

## B. Ohio Courts' Application of Atkins

Contrary to *Atkins*, the Ohio courts overemphasized Hill's adaptive strengths and relied too heavily on adaptive strengths that Hill exhibited in the controlled environment of his death-row prison cell. In so doing, they unreasonably applied clearly established law.

Ohio has adopted the three-prong standard set forth in *Atkins* for evaluating a claim of intellectual disability. *State v. Lott*, 779 N.E.2d 1011 (Ohio 2002). In *Lott*, the Supreme Court of Ohio specifically approved the definition of intellectual disability set forth in the then-current editions of the diagnostic manuals. *Id.* at 1014. Applying the standards in those manuals, individuals had significant limitations in adaptive skills if they exhibited deficits in at least two of the following ten areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.[8]

---

[8]The later editions of the AAIDD Manual have moved away from this scheme of categorization, instead forming three "clusters" of related skills and requiring a significant limitation in one of those broader domains.

In this case, the Ohio appellate court correctly set forth the three-prong *Atkins* standard as adopted by the Ohio Supreme Court in *Lott*. It also correctly noted that the second criterion under *Lott* requires the defendant to demonstrate "significant *limitations* in two or more adaptive skills, such as communication, self-care, and self-direction." *Hill*, 894 N.E.2d at 113 (emphasis added). The Ohio court then veered off track when it disregarded the prevailing clinical practice documented in the medical literature by placing undue emphasis on Hill's adaptive strengths, as opposed to his adaptive weaknesses, and by relying too heavily on the observations of prison guards concerning Hill's behavior in the highly regimented environment of his prison block. *Id.* at 124-25.

### 1. The Ohio Courts Inappropriately Focused on Hill's Adaptive Strengths

The Ohio courts' conclusion that Hill did not demonstrate significant limitations in two or more adaptive skill areas was the result of an inappropriate focus on Hill's adaptive strengths instead of the constitutionally required analysis of Hill's adaptive weaknesses. In determining that "Hill's adaptive skills are inconsistent with a mentally retarded individual," the state trial court focused extensively on Hill's interview with a reporter, his demeanor in interacting with law enforcement and the legal system, and the circumstances surrounding the Fife murder. *State v. Hill*, slip op. at 73-77. Those supposed adaptive strengths convinced the state trial court that Hill could not be intellectually disabled because he had "remarkable" communication and vocabulary skills and was self-directed. *Id.* at 74. Even assuming the truth of those findings—though there is substantial evidence in the record to contradict them—they demonstrate only that communication and self-direction may be some of Hill's strengths, and "prevailing clinical standards" hold that such strengths cannot be used to discount demonstrated weakness in other areas of adaptive functioning. *Moore*, 137 S. Ct. at 1050. Even cursory analysis of the evidence from the *Atkins* hearing reveals that Hill has had consistent and significant limitations in at least two identified areas of adaptive functioning—functional academics and hygiene/self-care—since

---

"Conceptual" skills include language skills, reading and writing abilities, self-direction, and grasping concepts of money. These conceptual skills may be collectively labeled as functional academics. "Social" skills focus on interpersonal relationships, responsibility, self-esteem, gullibility/naïveté, following rules/obeying laws, and avoidance of victimization. "Practical" skills focus on self-care and daily living. Such skills include preparing and eating meals, dressing, toileting, personal mobility and use of transportation, occupational skills, health care, and maintenance of safe environments.

childhood.  The record also supports finding limitations in two additional areas—social skills and self-direction.

With respect to functional academics, Hill was considered "mentally retarded" by the Warren City Schools.  He was diagnosed as mildly mentally retarded, "trainable mentally retarded," or "educable mentally retarded" several times before he turned 18, beginning with the recognition that he was a "slow learning child" when he began formal schooling at age 6.  He scored below 70 on every IQ test administered during his school years.  He attended special education classes for the entirety of his school career, which meant that all of his academic classes were taught at a very basic level.  He was "mainstreamed" only in physical education and music, and struggled even there to keep up with and socialize normally with his peer group.  There is no record of him taking "mainstream" classes in any academic subject area, i.e., math, reading, or history.  At age thirteen, he was sent to a school for intellectually disabled children, and was transferred to another, similar school at fifteen because of poor academic achievement and behavior.  At seventeen years old, after being arrested for, and pleading guilty to, two felony rape charges, the juvenile court placed Hill in a facility that housed youth offenders with mental disabilities or emotional problems.  There, Hill completed ninth grade in special education classes at age 18.  After being released, he returned to high school, but Fife's murder occurred six months later.

At age six, Hill did not know his age, but thought he was nine.  His reading and verbal skills were at the five-year-old level and he had a mental age of four years and six months.  At age 8 and 8 months, Hill was considered functioning at a "high kindergarten level."  At age 13, he was functioning at the "mid-2nd grade level" in reading and the "mid-1st grade level" in arithmetic.  Also when Hill was 13-years-old, a school psychologist set out "special instructional recommendations" that included teaching Hill his address and phone number, as well as how to tell time.  He exhibited weaknesses in reasoning ability, originality, verbal interaction, and a lack of intellectual independence.  By 14, he was reading at a first-grade level and his math skills were at a third-grade level, and he still had not mastered writing his own signature.  His teacher was working on self-control skills that would generally be mastered by a kindergarten student, including "working without being disruptive" and not touching other students inappropriately.

Teachers set academic objectives like learning to: tell time in five-minute intervals; write his own signature; shower regularly; put soiled clothing in the appropriate place; and eat and drink in a manner appropriate in a school setting. Hill was described as hyperactive and needing to complete tasks "one step at a time."

The record also demonstrates that Hill was deficient in hygiene and self-care. At the age of 14, he still needed to be told to shower regularly, brush his teeth, and apply deodorant every day. He would not independently follow through and take care of his hygiene unless he was told to do so. At approximately age 16, a group home officer noted that although Hill was "improving in his personal hygiene," he still "need[ed] constant reminder[s] to shower, brush his teeth, etc.[.]" Hill continued to have problems with his hygiene in prison and had to be reminded frequently to groom himself.

The record also demonstrates Hill had limitations in the area of social skills. For example, the district court pointed to the testimony of psychologists who spoke to Hill's "poor self-esteem, inability to interpret social situations and create positive relationships, and [the fact] that he was easily influenced by people, gravitated toward an antisocial peer group, and did not respond appropriately to authority figures." *Hill*, 2014 WL 2890416, at *38. Hill's school and court records demonstrate that he had trouble making friends. At 17, Hill was described as "socially constricted" and possessing "very few interpersonal coping skills."

Hill also showed limitations in at least one more area—self-direction. Hill was described as "easily led" in both his school and court records, and from periods both before and after he committed serious crimes while apparently acting alone. In school, Hill was described as immature and "easily led by others into trouble around school," like fighting. He was vulnerable to exploitation by older individuals, displayed inappropriate and immature behaviors in class, rarely considered the consequences before acting, and had trouble conforming his behavior to the rules or the law. When Hill was 13, he was described as exhibiting a "great deal of impulsivity." When Hill was 17, he was evaluated by a psychologist who concluded that he had poor judgment, "d[id] not think of consequences," was "highly suggestable," and "was 'likely to be exploited'" if placed in halfway home for adults "because of his 'passivity and limited

intellectual ability.'"  Another report from that same time expressed concern about his tendency to follow others.

In addition to his significant limitations in functional academics, self-care, social skills, and self-direction, the record also demonstrates that Hill has never lived independently, never had a driver's license or a bank account, never been able to perform a job without substantial guidance from supervisors, was labeled "functionally illiterate" at school and in prison, could never read or write above a third-grade level, and could never adequately sign his own name.

In sum, the record is clear that Hill was universally considered to be intellectually disabled by school teachers, administrators, and the juvenile court system, and that those same authorities documented deficits in several adaptive skills areas.  Hill consistently performed very poorly in school (functional academics);  there was consistent documentation that he had trouble maintaining proper hygiene despite reminders (self-care);  he had trouble making friends and responding appropriately to authority figures (social and communication); and he was described as a follower, easily led, and vulnerable to exploitation by adults (self-direction).  The record shows that these deficits largely continued into adulthood, particularly with respect to self-care and functional academics.  When these facts are applied to the clinical standards articulated by the Supreme Court in *Atkins* and by the Supreme Court of Ohio in *Lott*, they overwhelmingly indicate that Hill had significant limitations in at least two, and probably four, adaptive skill areas.  Any apparent strengths are not relevant to the inquiry.

The Ohio court's finding to the contrary does not comport with the clinical guidelines ratified by the Supreme Court for assessing adaptive deficits.  Hill's ability to communicate effectively and to direct his actions to a specified goal does not mean that he did not have significant limitations in other adaptive skill areas.  Instead of marshalling facts in opposition to the clear conclusion from the record evidence that Hill had significant limitations in at least functional academics and self-care, the Ohio court rested its conclusion on Hill's relative strengths in communication and self-direction.  And even within those two areas, the Ohio courts failed to grapple with the evidence in the record indicating that Hill's perceived strengths were actually weaknesses.

To the extent the Ohio courts addressed evidence in the record pointing to adaptive deficits, they turned to inapposite or irrelevant facts to "arbitrar[ily] offset[]" such evidence of deficits—a practice *Moore* expressly rejects. *See* 137 S. Ct. at 1050 n.8 ("[E]ven if clinicians would consider adaptive strengths alongside adaptive weaknesses within the same adaptive-skill domain, neither Texas nor the dissent identifies any clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths in which the [Texas Court of Criminal Appeals] engaged."). For instance, the state trial court discounted evidence of Hill's "consistently poor" academic performance by pointing to evidence in the record that Hill was "a healthy boy described frequently by his teachers as lazy, who admits to experimenting with drugs and alcohol, who assaults the defenseless, steals frequently and lies a lot," and who, by age 18, could "write in cursive, but prefer[red] to print." *Hill*, slip op. at 70. The trial court then pointed to a teacher's note, written in October 1981, describing Hill as "a bright, perceptive boy with high reasoning ability." *Id.* The Ohio appellate court summarized the evidence regarding Hill's childhood academic performance in similar terms, stating that "Hill's public school records amply demonstrate a history of academic underachievement and behavioral problems," and noting that he "was described by at least one of his special education teachers as 'a bright perceptive boy with high reasoning ability.'" *Hill*, 894 N.E.2d at 124. The court also noted that while there "are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred while he was acting alone." *Id.*

The problems with the courts' analyses of Hill's academic performance are manifold. As the district court noted, "the court's finding that Hill 'underachieved' academically or in any other adaptive skill as a child is squarely contradicted by the record. This Court could not find one reference in Hill's school records by a teacher, school administrator, psychologist, psychiatrist, or anyone else suggesting that Hill was capable of performing at a substantially higher level but chose not to.'" *Hill*, 2014 WL 2890416, at *26. And as clinical guidelines have long recognized—and as the experts in this case testified—evidence of behavioral problems or a conduct disorder simply does not undermine a simultaneous finding of intellectual disability. *See Atkins* Hr'g Tr. at 475 (Hammer test.); *id.* at 959-60 (Huntsman test.); *id.* at 573 (Olley test.) ("[I]f he's having conduct problems in school, that's neither here nor there to a diagnosis of

mental retardation."). The courts incorrectly discounted the fact that Hill was easily led because he committed crimes on his own. Under prevailing medical standards, however, Hill's prior criminal behavior should not be given weight in this analysis. Finally, the Ohio courts' focus on a note drafted by a teacher *in a school for intellectually disabled children* describing Hill as "'bright' and 'perceptive,' with 'high reasoning ability'" was, as the district court put it, "almost cynical in its selective misrepresentation of the facts." *Hill*, 2014 WL 2890416, at \*27. Throughout its opinion, the district court referred to certain findings and inferences by the Ohio courts as "troubling," "irrelevant," "problematic," and "squarely contradicted by the record." *Id.* at \*\*24-27.

The Ohio courts' handling of evidence regarding self-care is equally troubling. The Ohio Court of Appeals' sole reference to Hill's deficits with regard to self-care was its summary of testimony provided by a prison official "that Hill's self-care was 'poor but not terrible' and that Hill had to be reminded sometimes about his hygiene." *Hill*, 894 N.E.2d at 125. Such a statement downplays the record's extensive chronicling of Hill's struggles with hygiene, including the fact that an individual education plan established for Hill when he was nearly fourteen years old included an "[a]nnual [g]oal and [o]bjective" of helping Hill "learn to shower when necessary" and to "put soiled clothing in the appropriate place." *Atkins* Hr'g Tr. at 147, 193 (Hammer test.).

The state trial court also unduly relied on Hill's "initiative in coming to the police" after Fife's death, as well as his alleged efforts to misdirect the investigation and fabricate an alibi while under interrogation, as "evidence of Hill's ability concerning self-direction and self-preservation." *See Hill*, 2014 WL 2890416, at \*33. As the district court noted, "'[s]elf-preservation' is not among the adaptive skills measured under the clinical definitions of intellectual disability," and "self-direction" covers a host of behaviors—including "initiating activities appropriate to the setting" and "demonstrating appropriate assertiveness and self-advocacy skills"—either unrelated or directly contrary to Hill's decision to make contact with the police. *Id.* Contrary to the Ohio courts, the district court found Hill's "performance" during the police interrogation revealed him to be "childlike, confused, often irrational, and primarily self-defeating," and characterized Hill's attempts to change his story under pressure as failing to

"skillfully hid[e] his part" in Fife's death. *Id.* at *34. These actions were "quite the opposite of adaptive." *Id.* This is especially true where Hill's decision to approach the police did not "resolve his problems," but "succeeded only in immediately drawing the police's attention to himself." *Id.*

Hill's behavior during questioning also undermines the conclusion that he had strengths in self-direction. For example, Hill often changed his story or embellished his statements "at the slightest suggestion by the police, even when the information at issue was irrelevant or incriminating." *Id.* at *35. While the Ohio court focused on what it saw as Hill's abilities in the area of "self-direction" from around the time of the crime, it also ignored other evidence from around the same time illustrating that Hill had adaptive deficits. For example, at Hill's mitigation hearing, three psychologists testified that Hill was intellectually disabled at that time and had extremely poor adaptive functioning. On appeal, the Ohio Supreme Court and Court of Appeals found these psychologists' testimony credible and concluded that Hill was disabled. *See State v. Hill,* 595 N.E.2d 884, 901 (Ohio 1992); *State v. Hill,* Nos. 3720, 2745, 1989 WL 142761, at ** 6, 32 (Ohio Ct. App. Nov. 27, 1989).

It is true, of course, that the state trial court expressly "relie[d] upon the expert opinion of Drs. Huntsman, Hancock and Olley to conclude" that Hill had failed to demonstrate adaptive deficits. *Hill,* slip op. at 81. We have previously denied *Atkins* relief in an AEDPA case arising out of Ohio where, as here, two of the three mental health experts testified that the petitioner was not intellectually disabled. *O'Neal v. Bagley*, 743 F.3d 1010, 1023 (6th Cir. 2013) ("With expert testimony split, as it often is, the state court chose to credit Dr. Chiappone and Dr. Nelson over Dr. Tureen, and we cannot say from this vantage that it was unreasonable to do so."). However, *O'Neal* is distinguishable on its facts and Hill's claim for *Atkins* relief is much stronger than the petitioner's claim in *O'Neal*. For example, in *O'Neal* there was insufficient evidence to prove that the petitioner met the first prong in demonstrating "significantly subaverage intellectual functioning." *Id.* at 1022. Here, by contrast, Hill's IQ is so low that the Warden concedes that Hill satisfies the first prong. Additionally, O'Neal's claim for *Atkins* relief also failed because his adaptive deficits may well have been better explained by his drug abuse and personality disorder rather than organic mental illness. *Id.* at 1022-23.

Even though *Atkins* requires that determinations regarding intellectual disability be informed by the medical community, as discussed above, the Ohio courts should have rejected the expert testimony in this case. Requiring courts to be "informed by the medical community's diagnostic framework," *Moore*, 137 S. Ct. at 1048 (quoting *Hall*, 134 S. Ct. at 2000), does not authorize courts to tether their decisions to expert opinions that depart from that "diagnostic framework." As Dr. Olley recognized, and as the clinical guidelines make clear, "the AAMR manual specifically says you would expect that individual[s] would have some relative strengths and some relative weaknesses." *Atkins* Hr'g Tr. at 557 (Olley test.). And yet neither Dr. Olley nor Dr. Huntsman appeared to apply this crucial aspect of the clinical guidelines in assessing Hill's adaptive deficits.[9] Consequently, many of the same criticisms we have of the trial court's analysis of Hill's *Atkins* claim apply equally to Dr. Olley's and Dr. Huntsman's testimony.

Dr. Huntsman's report focuses almost exclusively on Hill's perceived adaptive strengths—his "remarkable memory for the history of his case," his detailed and "very complex explanation for how Raymond Fife came to be killed," and the "competencies" observed by staff members in prison. Supp. *Atkins* App'x at 1141. (Huntsman Report at 16.) Her testimony at the *Atkins* hearing was no different. *Atkins* Hr'g Tr. at 907 ("[I]t's my opinion that he clearly demonstrates behavioral *capacities* that are beyond retarded level.") (emphasis added). Dr. Olley's report and testimony suffer the same defects. *See* Supp. *Atkins* App'x at 1125 (Olley Report at 8) ("The available information on Mr. Hill's current functioning does not allow a diagnosis of mental retardation . . . . Mr. Hill's memory was very good in court on April 15, 2004, when he provided details of events. In [an] interview during this evaluation, Mr. Hill showed good memory of 20-year old events and the ability to express a complex explanation of the crime in order to support his claim of innocence."); *Atkins* Hr'g Tr. at 586 (defending his opinion, in part, because of the way in which Hill exhibited "a kind of thinking and planning and integrating complex information that is a higher level than I have seen people with mental retardation be able to do").

---

[9]Dr. Hancock, the third expert on whom the state trial court expressly relied, did not assess Hill's adaptive deficits. Instead, he was called upon "to review the test equating method used [by yet another expert, Dr. Sara Sparrow, whose opinion Hill wished the court to consider] to interpret scores in adaptive behavior testing of Danny Lee Hill and to examine other psychometric issues that may affect appropriate diagnostic process in the case." Supp. *Atkins* App'x at 3093. (Hancock Supp. Report at 1.)

In short, Drs. Olley and Huntsman adopted precisely the sort of analysis the Supreme Court has foreclosed. Courts cannot bypass the Supreme Court's clear instruction not to "disregard[] established medical practice," *Hall*, 134 S. Ct. at 1995, by relying on experts who have done just that. Consequently, it was unreasonable under the circumstances of this case for the Ohio courts to rely on Dr. Olley's and Dr. Huntsman's expert opinions in finding that Hill was not intellectually disabled. The state courts' failure to consider adequately Hill's adaptive deficits amounts to a sufficiently unreasonable application of the Supreme Court's decisions in *Atkins*, *Hall*, and *Moore* to warrant issuance of the writ.

2. The Ohio Courts Gave Undue Weight to Hill's Behavior in Prison

Although the Ohio courts' reliance on Hill's adaptive strengths without addressing the overwhelming evidence of his weaknesses in the areas of functional academics and self-care would be enough to justify issuance of the writ, we also hold that the Ohio courts unreasonably applied clearly established law by placing undue weight on a criminal defendant's behavior in prison when assessing his or her adaptive skills.

As mentioned above, *Atkins* drew from the consensus of the medical community as reflected in medical texts and treatises to define intellectual disability. 536 U.S. at 308 n.3. The medical literature available in 2008 prohibited the assessment of adaptive skills in atypical environments like prison. For example, the 2002 American Association on Mental Retardation says "[l]imitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture." AAMR-10, at 8. It continues: "This means that the standards against which the individual's functioning must be measured are typical community-based environments, not environments that are isolated or segregated by ability." *Id*. As the district court correctly noted, "death row is a segregated, highly structured and regulated environment" and reliance on Hill's prison records is problematic because they evaluate Hill's adaptive skills against those of other inmates on death row. *Hill*, 2014 WL 2890416, at *42.

Further, the district court noted that the weight of the testimony from various death row prison officials was limited by their potential bias against the inmates they were charged with

guarding, as well as the shortcomings affecting lay opinions about intellectual disability generally. *Id.* at **42-43. And in any event, as the district court noted, many of the prison officials' statements were "rife with contradictions, with themselves and each other." *Id.* at *43.

Assessing Hill's adaptive deficits as an adult is particularly challenging given the absence of any reliable testing to measure Hill's adaptive functioning and the lack of reliable evidence of how Hill would have functioned as an adult in general society as he has been incarcerated for all but six months of his adult life. Evidence of adaptive functioning in this kind of controlled setting is of limited value because inmates do not have the same opportunities to acquire new skills or show weaknesses in existing skills. Given the lack of evidence regarding Hill's likely adaptive performance as an adult in the general community, the Supreme Court and established clinical guidelines require consideration of all available evidence. Specifically, the testimony of prison guards who have known Hill only in a correctional setting should lead the court to treat their observations with a degree of skepticism. *United States v. Hardy*, 762 F. Supp. 2d 849, 899-900 (E.D. La. 2010) ("An institutional environment of any kind necessarily provides 'hidden supports . . . .'") (citing AAIDD-11, at 45 (2010)).

Here, the state court assessed Hill's adaptive skills almost exclusively by reference to the testimony of prison guards about Hill's behavior in a "controlled" prison environment, without mention of documentary evidence of Hill's deficits in a number of adaptive skill areas both before and after his incarceration. It did not mention any review of prison records, which reflect that prison officials always recognized Hill to be mentally incapacitated or "slow." As when he was in school, Hill was considered to be illiterate in prison. He was understood to have a "very limited writing ability," and he had other inmates write for him. Notes written from Hill to prison officials make clear that he had trouble keeping track of his prison account balance. According to fellow inmates, when Hill was given a task, he had to be carefully supervised because he could not remember how to complete the assigned task. At least one prison official reported that Hill was able to perform his job as a porter because the cleaning supplies were sorted by color, so Hill was not required to read the supplies' instructions.

The state courts' emphasis of and reliance upon prison guard testimony about Hill's behavior in prison without consideration of record evidence suggesting Hill had significant

limitations even in the "controlled setting" of his cell block goes against both the Supreme Court's precedent and long-established clinical practice. That error compounds the trouble with the state court's emphasis of Hill's strengths without independent consideration of his adaptive weaknesses because much of the evidence supporting the court's finding of Hill's adaptive strengths was based on observations of and testimony about Hill's behavior in a "controlled setting" as opposed to in the general community. Because that analysis disregards prevailing clinical standards, it amounts to an unreasonable application of the Supreme Court's decisions in *Atkins*, *Hall*, and *Moore*.

Because "[t]he medical community's current standards supply one constraint on States' leeway" in defining who is "intellectually disabled," the Ohio courts were not free to disregard the medical consensus on the appropriate standard for assessing whether Hill exhibited adaptive deficits. *Moore*, 137 S. Ct. at 1053. Application of the correct standard to the record evidence overwhelmingly supports the conclusion that Hill exhibited substantial deficits in at least two adaptive skillsets; consequently we disregard the state court's determination because it was the result of an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States" under 28 U.S.C. § 2254(d)(1).

## IV. Age of Onset

We also reject the state court's finding that Hill's intellectual and adaptive deficits did not manifest themselves prior to the age of 18 because clear and convincing evidence suggests otherwise. *See* 28 U.S.C. § 2254(e)(1). In fact, as noted above, Hill's disability was extensively documented before he turned 18 because he spent all of his school years in programs for the intellectually disabled and the juvenile justice system. The record is replete with comments from teachers concerning Hill's lagging academic performance, his poor memory, his lack of personal hygiene, his immature and inappropriate behavior in relation to his peers, and his tendencies as a follower. *Hill*, 894 N.E.2d at 128-29 (O'Toole, J., dissenting). In addition to school records, the state court record contains testimony to similar effect from several staff members at a halfway house in which Hill resided as a teenager, as well as a counselor at the juvenile correction facility where he was placed.

All the of these significant adaptive skill deficits manifested themselves before Fife was killed in 1985 and, as noted by the experts, there was no reason to suspect that Hill was malingering as a child despite his apparent malingering on the assessments administered in April 2004. The records cover the time frame from 1973 to 1984, six months before the murder for which Hill was sentenced to death, and 20 to 30 years before the Supreme Court decided *Atkins*. Hill could not have been faking intellectual disability to avoid the death penalty. Accordingly, we reverse the state courts' conclusion on the age-of-onset prong as it is contradicted by clear and convincing evidence.

We recognize, of course, that state court determinations of fact are entitled to a great deal of deference. But "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Rather than address the abundant evidence in the record of Hill's adaptive deficits as a child and teenager, the state trial court focused on his ability to engage in "a one-man crime spree at the age of 17" and his ability to "hold his own during police interrogation of the Fife murder." *Hill*, slip op. at 82. In so doing, the trial court inappropriately focused on perceived adaptive strengths, ignored clinicians' warnings not to conflate criminal behavior with adaptive functioning, *see, e.g.*, *Atkins* Hr'g Tr. at 208-09 (Hammer test.), and failed to acknowledge that Hill's performance during the police interrogations was, in the words of the district court, "childlike, confused, often irrational, and primarily self-defeating." *Hill*, 2014 WL 2890416, at *34. In a three-sentence summary, the state appellate court affirmed the trial court's findings. *Hill*, 894 N.E.2d at 126. Such selective reliance on mostly irrelevant pieces of evidence to find that Hill lacked adaptive deficits before the age of 18 constitutes "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

Consequently, we conclude that the state court's finding that Hill's intellectual and adaptive deficits did not manifest before the age of 18 amounts to "an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[10]

### V.  Suppression of Pretrial Statements to the Police

In addition to challenging his eligibility for the death penalty after *Atkins*, Hill raised several challenges to his conviction in his habeas petition.  Because we remanded his case to the state court after *Atkins* was decided in 2002, we did not reach the merits of those claims.  *Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002).  We do so now and **AFFIRM** his conviction.

Hill contends that the Ohio courts unreasonably applied clearly established federal law in determining that Hill's statements to police were admissible.  Hill maintains that his statements were "involuntary and false" because:  his intellectual disability made him especially vulnerable to police coercion; his intellectual deficiencies were known by the police, including interrogators Sergeant Thomas Stewart, Sergeant Dennis Steinbeck, and his physically abusive uncle, Detective Morris Hill; the police made statements to Hill that led him to believe that denying guilt was "hopeless"; and Hill lacked the intellectual capacity to understand the legal consequences of the statements he made (and the police recorded) while he was at the Warren police station.

Because the Ohio courts rejected this claim on the merits as part of Hill's direct appeal, *see Hill*, 595 N.E.2d at 890-91; *Hill*, 1989 WL 142761, at **5-8,  Hill must show that the state courts' decisions involved an unreasonable application of clearly established federal law, as determined by the Supreme Court.  S*ee* 28 U.S.C. § 2254(d)(1).  "[A]n unreasonable application of th[e Supreme Court's] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice."  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citation and quotation marks omitted).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "[a] suspect in custody must be advised . . .[,] 'prior to any questioning[,] that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the

---

[10]As we have decided the merits of Hill's *Atkins* claim in his favor, we pretermit discussion of Hill's claim of ineffective assistance of counsel during his *Atkins* proceedings in state court.

presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting *Miranda*, 384 U.S. at 479). This holding was necessitated by the Supreme Court's acknowledgement that "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." *Dickerson v. United States*, 530 U.S. 428, 434-35 (2000) (citation, quotation marks, and ellipses omitted). Thus, "[w]hen police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985); *see also Lego v. Twomey*, 404 U.S. 477, 487-88 (1972) ("[*Miranda*] excludes confessions flowing from custodial interrogations unless adequate warnings were administered and a waiver was obtained.").

In this case, it is undisputed that Hill was given *Miranda* warnings and signed a waiver prior to making the recorded statements that he sought to suppress at trial. Hill's challenge, then, is to the validity of that waiver. He argues that because his waiver was not knowing, intelligent, and voluntary, it was invalid.

A suspect may waive his *Miranda* rights only if "the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation and quotation marks omitted).

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation [reveals] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (citations and quotation marks omitted). For a waiver to be knowing and intelligent, the suspect must be "fully advised of [his] constitutional privilege[s]." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). To be voluntary, a confession may not be "the product of coercion, either

physical or psychological." *Rogers v. Richmond*, 365 U.S. 534, 540 (1961). However, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990); *see, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 317 (1985) ("[T]he [Supreme] Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily.") (citation omitted).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary . . . .'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Although a suspect's mental condition may be a "significant factor in the 'voluntariness' calculus," that "mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'"[11] *Id.* at 164.

On December 16, 1985, the Ohio state trial court held a hearing on Hill's motion to suppress his audio- and video-taped statements to the police.[12] At the suppression hearing, witnesses testified to the following facts.

On September 12, 1985, two days after Fife was attacked, Hill went to the Warren Police Department and approached Sergeant Stewart to talk about that "boy being beat up in the field." R. 28, PageID# 2748-49. Stewart, who was a friend of Detective Hill and had known (Danny) Hill since he was approximately six years old, agreed to talk to Hill in the "Narcotics Room." *Id.* at 2750-51, 2782. Stewart testified that Hill had come to the police station voluntarily, i.e., that no one had "brought him in," and Hill's testimony corroborated this assertion. *Id.* at 2751; R. 29, PageID# 3130.

---

[11]Under Supreme Court precedent, a person who meets the standard for intellectual disability may not be executed. As discussed extensively above, we find that Hill is intellectually disabled and is entitled to have the writ issue with respect to his sentence. However, the requirements for determining whether someone is intellectually disabled under *Atkins* and *Lott* are different from the requirements for determining whether a waiver is knowing and voluntary under *Miranda*. And a person who is intellectually disabled may still be able to knowingly and voluntarily waive his *Miranda* rights.

[12]The transcript of the suppression hearing can be found in the district court record at R. 28 and R. 29 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28, 1997). Because the pagination in the original transcript is unclear, we will cite to the pagination used by the district court.

Once in the Narcotics Room, Hill told Stewart that he had seen another boy, Reecie Lowery, riding the bike of the boy "who was beat up." R. 28, PageID# 2751-52. When Stewart asked Hill, "How do you know it's the boy's bike?", Hill responded, "I know it is." *Id.* at 2752. Hill then told Stewart about the bike's location and encouraged Stewart to "go out and get the bike" before Lowery put it back in the wooded field where Fife was attacked. *Id.* After Hill told Stewart that he was willing to show him where the bike was located, Stewart and Hill began talking about various persons, including Tim Collins and Tim Combs (Hill's co-defendant). Hill insinuated that both Collins and Combs liked boys and might have been the ones who attacked Fife. At some point during their talk, Hill mentioned that Fife was choked with his underwear. *Id.* at 2756-57.

Eventually, Stewart drove Hill to look for the bike, but because it was raining and visibility was poor, Stewart and Hill did not go to the wooded field. Instead, Hill showed Stewart where Combs lived. *Id.* at 2753-54. After dropping Hill off at his house, Stewart compiled a report that he shared with his fellow officers, including Sergeant Steinbeck. *Id.* at 2755, 2757-58.

The next day, September 13, 1985, Steinbeck went to Hill's home around 9:30 or 10:00 in the morning to follow-up on the information that Hill had given to Stewart. Steinbeck asked Hill to come talk to him at the police station and Hill agreed. *Id.* at 2762-63, 2881. Hill was driven to the police station in the front seat of Steinbeck's police cruiser and was not booked, fingerprinted, or placed under arrest. Steinbeck read Hill his *Miranda* rights aloud, asked Hill if he understood those rights, and had Hill sign a waiver of his *Miranda* rights before questioning Hill off and on for approximately three hours. *Id.* at 2863-64, 2882-84. During those three hours, Hill never asked for the questioning to stop, tried to leave, or asked to see an attorney. *Id.* at 2865-66, 2885-89. After talking to Hill, Steinbeck transcribed a copy of Hill's statement, which also included a recital of his *Miranda* rights. However, Hill did not sign the statement that day because Steinbeck had forgotten to ask him to do so after telling Hill he could go home with his mother. *Id.* at 2866-69, 2889-90.

On September 16, 1985, both Steinbeck and Detective Hill went to Hill's home, ostensibly to ask Hill to sign his statement from September 13 and to ask Hill's mother for a

written statement regarding Hill's alleged alibi. After putting up some initial resistance to speaking to the police again, Hill, at the behest of his mother, agreed to come down to the police station, this time accompanied by his mother. Hill was not placed under arrest, booked, fingerprinted, or handcuffed. *Id*. at 2869-70, 2890-92, 2899-2901, 2930-32.

In the interrogation room, and apparently separated from his mother, Hill was verbally advised of his *Miranda* rights by Detective Hill. *Id*. at 2871, 2901-02, 2933. Hill indicated that he understood his rights. *Id*. at 2902. Although not initially present, Sergeant Stewart eventually encountered Sergeant Steinbeck and Detective Hill in the interrogation room with (Danny) Hill. *Id*. at 2758, 2872, 2908. At some point, officers told Hill they did not believe he was telling the truth, and Stewart told Hill that he needed to be honest if he had "anything to do with [Fife's murder]." *Id*. at 2872, 2909-10. Officers also told Hill that it would "benefit him" to tell them the truth, believing that Combs would likely blame the attack on Hill alone. *Id*. at 2909.

Apparently at Hill's request, Detective Hill was left alone with his nephew. According to (Danny) Hill, while he and Detective Hill were alone, Detective Hill "threw [him] against the wall," slapped him across the face, and told him that he "better tell" the police what happened. *Id*. at 2759, 2810-11, 2859, 2910, 2936-37, 2953. Hill also testified that his uncle kicked him under the table in order to prompt Hill to (1) consent to his statement being taped and (2) begin talking to police at the beginning of the taping.

Detective Hill, unsurprisingly, described the time he spent alone with his nephew very differently, testifying:

> At that point in time, you know, I set [sic] there, and I tried to let Danny know that wasn't anyone [sic] going to hurt him. No one was going to do anything to him, but [I also told him] the fact that I kn[e]w that he was involved in the homicide, and I wanted to get the truth out of him. At that point in time, he looked at me and tears started to come from his eyes. When tears started coming from his eyes, he told me . . . , "I was there. I was in the field when he got murdered." When the young Fife kid got murdered.[13]

R. 28, PageID# 2937. When Detective Hill emerged from the interrogation room a few minutes later, he told the other officers that Hill was going to cooperate and tell them what happened. At

---

[13]Detective Hill also denied kicking his nephew.

the time Detective Hill made this announcement, Hill was either crying or had tears in his eyes. *Id*. at 2759, 2811, 2839, 2873, 2937-38.

At Stewart's suggestion, Hill gave the police permission to tape his statement. *Id*. at 2759-60, 2873-76, 2912. Sergeant Steinbeck, Sergeant Stewart, and Detective Hill were all present when Hill gave this initial audiotaped statement, as well as when Hill gave a second statement that was videotaped by Detective James Teeple. *Id*. at 2874-75. According to Stewart, Hill was not crying during the taped statement itself. About halfway through the audio-taping, the police asked Hill to sign the statement he had given to Steinbeck on September 13. *Id*. at 2903. Hill was also read his *Miranda* rights once more at some point prior to giving the second, videotaped statement. *Id*. at 2876, 2923, 2963-64. While giving his statements, Hill never asked to stop the interrogation, requested an attorney, or asked to leave. Sometime after the interrogation, Hill was placed under arrest based on the details included in his statements. *Id*. at 2776.

When asked questions about the nature of the interrogation generally, both Detective Hill and Sergeant Stewart denied that the police threatened or made promises to Hill during the interrogation, and asserted that Hill never asked for a lawyer. *Id*. at 2760, 2772, 2935, 2938. When prompted by the prosecutor about Hill's previous encounters with the police, Detective Hill estimated that by the date of the September 16, 1985 interrogation, Hill had been arrested by the Warren Police Department "[a]pproximately 15 to 20 times." *Id*. at 2929. Both Detective Hill and Sergeant Steinbeck testified that they had arrested Hill on prior occasions and had read him his *Miranda* rights "[m]any times." *Id*. at 2876, 2928-29. And two of the prosecution's exhibits at the suppression hearing included a waiver form and voluntary statement—both of which included a recitation of *Miranda* rights—signed by Hill on March 6, 1984, which was approximately a year-and-a-half before the September 16, 1985 interrogation.

In adjudicating this claim, the state appellate court rejected Hill's argument that his waiver of his *Miranda* rights was invalid. *Hill*, 1989 WL 142761, at *5. Acknowledging that it needed to make "discrete inquiries" as to both the "knowing and intelligent" and "voluntary" aspects of Hill's waiver, the appellate court considered these criteria in turn.

With regard to the knowing and intelligent factor, the appellate court noted that although the "lack of mental acuity . . . can interfere with an accused's ability to give a knowing and intelligent waiver," there is no bright line rule for distinguishing between "those capable of an intelligent waiver from those who lack the ability to do so." *Id.* The appellate court also acknowledged the Supreme Court's admonition in *Connelly* that a suspect's mental condition, by itself, does not necessarily prevent him from effectively waiving his *Miranda* rights. *Id.* In analyzing the facts of Hill's case specifically, the appellate court opined:

> [Hill] admittedly suffers from some mental retardation (although the evidence presented is divergent as to the severity of the handicap) and has had concomitant difficulties in language comprehension throughout his formal education. [Hill] is categorized as being mildly to moderately retarded. Evidence was presented which indicates that appellant is illiterate and this court acknowledges that literal recognition of each word contained in the "*Miranda* Rights" and/or "waiver form" may be beyond [Hill's] mental comprehensive capacity.
>
> However, from the record here, particularly during the suppression hearing, this court is also aware (as was the trial court below) of the long and multi-faceted exposure [Hill] has had with the state's criminal justice system. The evidential table in this case also demonstrates that [Hill] exhibited a functional capacity to understand these rights, including the right to appointed counsel. This was evident from the exchange that occurred during the audio and video tape sessions. The officers who interrogated [Hill] had either significant contact with him and/or had questioned him on prior occasions and had developed informed estimates as to [Hill's] ability to understand, albeit in a vernacular sense, all aspects of the *Miranda* warning. The audio and video tapes of [Hill's] interrogations disclose that [Hill] was capable of understanding the questions put to him and of responding intelligently.
>
> Moreover, the behavior of [Hill] during the police investigation belies the notion that he was no more than a malleable victim of police suggestion. [Hill] possessed the requisite intelligence to implicate other persons in the murder and was capable of modifying his story when inconsistencies were demonstrated to him. Additionally, [Hill] qualified and corrected the police officers' misstatements of the factual scenario which he had related to them. He also was able to follow "verbal concepting," displaying an understanding of the officers' direction of questioning and the dialogue utilized during the interrogation.

*Hill*, 1989 WL 142761, at *6. Based on the aforementioned concerns, and citing the Supreme Court's decisions in *Miranda* and *Lego* in support, the state appellate concluded that Hill's waiver was knowing and intelligent. *Id.*

In addressing voluntariness, the appellate court rejected Hill's argument that his waiver was involuntary "as a result of his mental [infirmities] and the coercive action of the police." *Id.* First, the court noted that Hill's IQ was not necessarily dispositive as to whether he was incapable of voluntarily waiving his *Miranda* rights, particularly since he had been read those rights in his many prior encounters with police. *Id.* at **6-7. In addressing Hill's argument that his intellectual deficiencies made him vulnerable to the police officers' "psychological ploys," the appellate court noted that Hill was read his *Miranda* rights multiple times on September 13 and 16, 1985, and "appeared articulate and coherent as he answered questions." *Id.* at *8. Finally, in concluding that the record was "devoid of evidence indicating that the custodial interrogation of [Hill] violated his constitutional rights," the appellate court reasoned that because (among other things): (1) Hill originally approached the police on September 12 of his own accord; (2) Hill was read his *Miranda* rights numerous times without ever being placed under arrest; and (3) "[t]he recorded conversations [between Hill and the police] d[id] not suggest the use of any improprieties by the police," Hill's *Miranda* claim was without merit. *Id.* at **9-10.

The Ohio Supreme Court ruled similarly, stating: "Upon a careful review of the record, we can discern no coercive or overreaching tactics employed by the police during questioning." *Hill*, 595 N.E.2d at 890. In making this finding, the court explicitly acknowledged that before Hill turned 18, Detective Hill "would at times physically discipline [his nephew] at the request of [Hill's] mother."[14] *Id.* In fact, the court appeared to credit Detective Hill's version of events— i.e., that "[Hill] stated to [Detective] Hill that he was 'in the field behind Valu King when the young Fife boy got murdered.'" *Id.* The court also found, based on the Supreme Court's ruling in *Connelly* and Hill's "his prior dealings with the criminal process as a juvenile," that Hill's "mental aptitude did not undercut the voluntariness of his statements or his waiver of *Miranda* rights." *Id.* Finally, the Ohio Supreme Court rejected Hill's contention that his waiver was rendered involuntary by virtue of the police's tactics during the interrogation. *Id.* at 891 ("Upon a careful review of the testimony and the audiotape and videotape statements, we do not find that

---

[14]Hill was 18 at the time of the September 16, 1985 interrogation, and Detective Hill testified at the suppression hearing that he had not physically disciplined his nephew since at least six to eight months prior. R. 28, PageID# 2976.

the interrogation tactics used by the police officers, even in light of [Hill's] mental capacity, rendered the statements involuntary, or that the officers improperly induced [Hill] to make incriminating statements.").

Reviewing the state courts' decisions under § 2254(d)(1), the district court found that Hill's arguments that he should be granted habeas relief on this claim were without merit. *Hill v. Anderson*, No. 4:96-cv-00795, 1999 U.S. Dist. LEXIS 23332, at **78-92 (N. D. Ohio Sept. 29, 1999).

Applying AEDPA's deferential review standard, we ask whether the state courts unreasonably applied Supreme Court precedent in finding that Hill's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. *See* 28 U.S.C. § 2254(d)(1). *Connelly* tells us that a compromised mental state does not, "by itself and apart from its relation to official coercion," vitiate a defendant's ability to waive his *Miranda* protections. *See* 479 U.S. at 164. And *Miller v. Fenton*, 474 U.S. 104 (1985), directs us to treat state-court findings on "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings" as "conclusive" on habeas review if they are "fairly supported in the record." *Id.* at 117.

In light of these admonitions, the state courts' conclusion that Hill effectively waived his *Miranda* rights was not "unreasonable" as that term has been defined by the Supreme Court. The state courts could plausibly credit Detective Hill's account of his interrogation techniques over Hill's allegations of physical abuse to find a lack of undue coercion and could point to Hill's prior experiences with the criminal justice system and the *Miranda* process as evidence that Hill understood the nature of his waiver.

Although the required deference to the state courts' finding compels our holding on this issue, we wish to express our consternation with this result. The record contains ample evidence demonstrating that Hill's waiver was neither voluntary nor knowing. Hill was interrogated, in private, by a police-officer uncle who admitted to disciplining Hill physically in the past, and who allegedly "'threw [Hill] against the wall,' slapped him across the face, and told him that he 'better tell' the police what happened" during the course of the interrogation. *Supra* p. 28. Hill's

uncle then purportedly kicked Hill under the table to induce his consent to a videotaped confession and kicked Hill again when he was reluctant to begin the confession. When considered alongside Hill's intellectual disabilities, Detective Hill's behavior raises grave questions about the voluntariness of Hill's waiver.

And while Hill was certainly exposed several times to *Miranda* warnings, we are not convinced that he ever registered the warnings' meaning. During the suppression hearing the state trial court held in 1985, Hill's attorney asked Hill a number of basic questions about his understanding of *Miranda*:

> Q: [W]hat are your Constitutional Rights?
> A: I don't know.
> Q: What's the word constitution mean?
> A: I don't know.
> Q: What's the word appointed—
> A: When you point at somebody.
> Q: You point at somebody?
> A: Yeah.
>
> . . . .
> Q: When the police talked to you, did you go ahead and talk to them?
> A: Yes.
> Q: Why?
> A: They police. [sic] You're supposed to talk to them.
> Q: You have to talk to them?
> A: Yep!
> Q: Do you know what's an attorney? [sic]
> A: I don't know.

R.29, PageID# 3114-16.

It is difficult, in light of this testimony, to accept the state courts' determination that Hill "exhibited a functional capacity to understand [his] rights." *Hill*, 1989 WL 142761, at *6. Nevertheless, because of the procedural posture of this case, we are compelled to affirm the district court.

Accordingly, we **AFFIRM** the district court's denial of habeas relief as to his suppression claim.

**VI. Inflammatory Statements by the Prosecutor During Hill's Bench Trial**

Hill also makes a prosecutorial misconduct claim based on the prosecutor's allegedly inflammatory statements to the three-judge panel that convicted Hill and sentenced him to death.

This claim is governed by § 2254(d)(1). As indicated above, Hill must show that the state court's decision "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

The full-text of the "inflammatory statements" challenged by Hill may be found in his opening brief. Some of those comments included:

- A reference to Raymond Fife being a 12-year-old boy from the community who had a "right to live," a right to "be in school," and a right "to be here today";
- Statements that Hill was an "animal," who "destroyed and devoured" Fife, and "would make the Marquis de Sade proud";
- A statement that "you don't necessarily have fingerprints on everything" with reference to the apparent lack of Fife's fingerprints on his bike;
- The prosecutor's opinion about which expert witness on a particular issue was "more qualified";
- A statement that Detective Hill did not want to testify against his nephew;
- A reference to Hill being a "poor, dumb boy" who nonetheless violently raped two women and therefore "relishe[d] . . . inflicting pain and torture [on] other human beings";
- A statement that Hill put Fife through a "living hell," that Fife "had no justice while he was living," and that justice demanded a guilty verdict;
- The prosecutor's opinion that defense counsel had not shown "any mitigating factors" and that the aggravated factors "clearly outweigh[ed] the absence of any mitigation";
- Two more references to Hill's history of sexual assault, which the prosecution argued belied the idea that Hill had "difficulty with his motors skills";
- A rambling soliloquy about how the prosecution would have liked to called Fife as a witness so he could describe the beating, strangulation, and sexual assault he endured, but Fife was "not here to testify about that thanks to [Hill]." The prosecutor also stated that Fife, if alive, would have testified about how he missed his family and his friends;
- A reference to Hill as "this manifestation of evil, this anomaly to mankind, this disgrace to mankind."

In adjudicating this claim as part of Hill's direct appeal, the Ohio Supreme Court (1) noted that trial counsel never objected to any of the "complained-of comments," (2) opined that those comments were therefore subject to plain error review only, and (3) concluded that the prosecutor's statements amount to "neither prejudicial error nor plain error[.]" *Hill*, 595 N.E.2d at 898. The Ohio Supreme Court also noted that in Ohio, "[courts] indulge in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *Hill*, 595 N.E.2d at 898 (quoting *State v. White*, 239 N.E.2d 65, 70 (1968)).

The district court rejected Hill's prosecutorial misconduct claim as well, reasoning that:

> [Hill's] case was tried before a three judge panel [that] presumably was able to remember the evidence presented at trial and not be misled by any of the prosecutor's statements. Most of the statements were harmless . . . . Three judges should have been able to disregard any intended undue influence.[15]

1999 U.S. Dist. LEXIS 23332, at *110. Accordingly, the district court concluded that the Ohio Supreme Court's determination that "no prejudicial or plain error occurred . . . was not an unreasonable application of clearly established law." *Id.* at **110-11.

In assessing whether the Ohio Supreme Court's decision involved an unreasonable application of federal law, the relevant Supreme Court holding is the Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), which held that "a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 576 U.S. 37, 45 (2012) (quoting *Darden*, 477 U.S. at 181). The Supreme Court has also held that "the *Darden* standard is a very general one, leaving courts 'more leeway in reaching outcomes in case-by-case determinations.'" *Id.* at 48 (citation, quotation marks, and ellipses omitted).

In *Darden*, the Supreme Court found that comments similar to some of those made by the prosecutor in this case—particularly allusions to the death penalty and the defendant being an

---

[15]The state appellate court, in adjudicating this claim, similarly noted that although some of the prosecutor's comments would have "perhaps [been] prejudicially erroneous in a jury trial, [that] was not so [in Hill's case]." *Hill*, 1989 WL 142761, at *15.

"animal"—were improper.  477 U.S. at 179-80.  Those comments, unlike the comments in this case, were made before a jury, not a three-judge panel. *Id.* at 170-71.  Nonetheless, the Supreme Court noted that these improper statements did not "manipulate or misstate the evidence, [or] implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id.* at 182.

In this case, it is clear that the prosecutor's comments were emotionally charged and designed to paint Hill in a bad light.  However, it does not appear that they misstated the evidence in the case or implicated Hill's constitutional rights.  Further, any efforts to play on the emotions of the three-judge panel would likely have been futile.  Although they may not adopt a presumption as strong as the one "indulged" by the Ohio courts, federal courts similarly presume that a judge, as the trier of fact, can readily identify credible evidence, *United States v. Thomas*, 669 F.3d 421, 425 (4th Cir. 2012), give proper weight to the evidence, *Caban v. United States*, 728 F.2d 68, 75 (2d Cir. 1984), and understand what law is relevant to his or her deliberations, *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986).  And Hill has put forth no evidence indicating that the three-judge panel that tried his case was incapable of discerning what constitutes admissible evidence and parsing such evidence out from any inflammatory or irrelevant[16] comments by the prosecutor.[17]  For these reasons, we conclude that the decision by the Ohio Supreme Court was not an unreasonable application of clearly established law.

We **AFFIRM** the district court's denial of habeas relief as to Hill's prosecutorial misconduct claim.

---

[16]For example, the three-judge panel disclaimed any reliance on Hill's "prior crimes . . . in reaching its verdict."  *See Hill*, 595 N.E.2d at 893.

[17]Hill's reference to a single line in the panel's opinion that referred to Hill and Combs' "blood lust characterized by a series of acts of torture, rape, and murder," does not change this conclusion.  The rest of the opinion describes Fife's injuries, and the means by which they were inflicted (based on the evidence at trial), in great detail.  The opinion also indicates that the judges were struck by the "total lack of remorse" shown by Hill appearing at the police station to seek a reward after Fife's death.  Looking at the document as a whole, there is no indication that the comment with which Hill takes issue was derived from the prosecutor's statements rather than the judges' own assessments of the offenses.

**VII. The Trial Court's Failure to Hold a Pretrial Competency Hearing**

Lastly, Hill argues that the trial court's failure to inquire about Hill's competency denied him a fair trial under the due process clause of the Fourteenth Amendment. Here, the term "trial court" refers to the court that tried Hill's underlying offenses in 1985 and 1986.

This claim is governed by § 2254(d)(1). As indicated above, the Supreme Court has held that to obtain relief under § 2254(d)(1), the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). In assessing competence, the relevant question is whether the defendant's "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). If the defendant's mental condition meets this description, the courts may not try him.[18] *Id*.

Hill maintains that because the trial court knew that he had "limitations in vocabulary, ability to calculate, and ability to draw" and "could not recognize or understand a majority of the words on the *Miranda* waiver form," the trial court should have "conduct[ed] further inquiry into [Hill's] competency to stand trial." Hill's Br. at 124-25. With regard to this final issue, Hill requests that this Court determine "not whether the state court was unreasonable in finding Danny competent to stand trial, but whether it was unreasonable under *Pate*[19] and *Drope*[20] not to make such an inquiry in the first instance." *Id*. at 124. Hill also argues, with no elaboration and

---

[18]Again, our conclusion that Hill is intellectually disabled and thus ineligible for execution under *Atkins* does not mean that Hill was incompetent to stand trial or that the trial court should have presumed his incompetence and ordered a competency hearing *sua sponte*. The two inquiries are different, and even *Atkins* recognizes that "[m]entally retarded persons frequently . . . are competent to stand trial." 536 U.S. at 318.

[19]*Pate v. Robinson*, 383 U.S. 375 (1966).

[20]*Drope v. Missouri*, 420 U.S. 162 (1975).

minimal citation to the record,[21] that the Ohio Supreme Court "unreasonably applied *Pate and Drope*" in determining that Hill was competent to stand trial. *Id*. at 125.

The Warden, for his part, asserts that "[a]lthough Hill is intellectually limited, his demeanor at trial was such that the trial court had no reason to *sua sponte* assess Hill for competence to stand [trial]." The Warden also argues that:

> The trial record gives every indication that Hill was compliant, cooperative and appropriately attentive to the proceedings. Moreover, the trial judge had ample opportunity to assess Hill's ability to navigate through the trial proceedings, where Hill testified extensively during a pre-trial suppression hearing, and also had a direct colloquy with the trial court for acceptance of the jury waiver. In addition, none of the three mental health experts who testified for the defense at trial expressed a concern about Hill's competence to stand trial.

Warden's Br. at 97. Hill's reply brief does not address these contentions.

Neither the state appellate court nor the Ohio Supreme Court opinions from Hill's direct appeal noted Hill's competency argument as one of his nineteen assignments of error and twenty-five propositions of law, respectively. *See generally State v. Hill*, 595 N.E.2d 884 (Ohio 1992); *State v. Hill*, Nos. 3720, 3745, 1989 WL 142761 (Ohio Ct. App. Nov. 27, 1989). Instead, the only similar claims addressed by these courts pertained to Hill's arguments that he could not knowingly and voluntarily waive his right to counsel or his right to a jury trial due to his alleged intellectual disability. *See, e.g.*, *Hill*, 595 N.E.2d at 890-91, 895; *Hill*, 1989 WL 142761, at **3, 5-7, 13-14. The district court found that Hill raised the issue of competency only under state law, not federal law, and that Hill did not raise the competency claim under federal law until filing for state post-conviction relief. *Hill*, 1999 U.S. Dist. LEXIS 23332, at **92-93. On this basis, the district court concluded that Hill's competency claim was procedurally defaulted. *Id.* at **93-94 (citing *State v. Hill*, No. 94-T-5116, 1995 WL 418683 (Ohio Ct. App. June 16, 1995)). The Warden argues that even if Hill's claim was not procedurally defaulted, it fails on the merits. We agree.

---

**[21]**This issue occupies three pages in Hill's opening brief and just over a page in his reply brief. The only record citation in the opening brief seeks to demonstrate that Hill "could not recognize or understand a majority of the words on the *Miranda* waiver form."

On December 16, 1985, the trial court held a hearing on Hill's motion to suppress his statements to the police. Defense counsel called Hill as a witness to testify with respect to "the circumstances under which [he] gave statements to the police department." R. 29, PageID# 3101. In response to the trial court's questions, Hill indicated that he understood the purpose and nature of the hearing. *Id.* at 3103-04. He went on to testify about the means by which he arrived at the police station, as well as his inability to leave police custody prior to the arrival of his mother on Friday, September 13, 1985. On Monday, September 16, 1984, Hill returned to the police station at his mother's behest with his uncle, Detective Hill, and another police officer, Sergeant Steinbeck. As discussed earlier, Hill testified that while he and Detective Hill were alone, Detective Hill threw Hill against the wall, slapped him, and told him to tell the police what had happened. Hill also claimed that after being physically abused by his uncle, he told the police what they wanted to hear because he was afraid of both Detective Hill and the other officers. *Id.* at 3114, 3118-19.

Defense counsel, for his part, attempted to demonstrate that Hill could neither read nor write and that Hill signed the *Miranda* waiver without understanding its contents or knowing what it meant; meanwhile, the prosecutor attempted to demonstrate that Hill had been to the Warren police department many times before based on theft-related crimes and was therefore familiar with the department's *Miranda* form. *Id.* at 3107-09, 3115, 3121-23, 3152-53, 3155. On cross-examination, Hill testified that he signed the *Miranda* waiver because the police told him to do so. *Id.* at 3135-37. Hill's testimony ended following questions from the trial court about Hill's alleged physical abuse at the hands of Detective Hill.

Hill appeared before the trial court once more on January 7, 1986, this time to waive his right to a jury trial. *See Hill*, 595 N.E.2d at 889. The trial court's colloquy with Hill, which was designed to determine whether Hill's waiver was knowing and voluntary, included an explanation of the jury selection system, the role of the jury, the jury waiver's effect on some of Hill's pending motions, defense counsel's possible motives for seeking to waive Hill's right to a jury trial, and the differences between a jury and three-judge panel in terms of number of persons, familiarity with the law and the facts of the case, and demographic composition. The trial court read the waiver aloud to Hill and suggested the Hill go over the waiver with his

attorney. Waiver of Jury Trial Hr'g Tr. at 10-11.**22** Hill indicated that he had discussed the issue of waiver with both his attorney and his mother, and there was a 25-minute recess in which the attorney and Hill's mother apparently discussed the waiver with him further. *Id*. at 5-6. After the recess, Hill affirmatively stated that he wanted to be tried by the three-judge panel. *Id*. at 12.

A review of Hill's testimony during the December 16, 1985, suppression hearing reveals that Hill claimed to understand the nature of the hearing and was able to answer questions posed by the prosecutor, defense counsel, and the trial court. Hill stated more than once when he did not understand or did not know the answer to a question, either on his own or with attorney prompting. He also appeared to understand the role of the trial judge. Hill's interactions with the trial court at the January 7, 1986 hearing on his waiver of jury trial also failed to raise any red flags regarding competence. Although the trial court did most of the talking, Hill did not express any confusion about the nature of the waiver, and was given an opportunity to go over the considerations discussed by the trial court with his attorney and mother before and during the hearing. After Hill conferred with his attorney, the following exchange took place:

> COURT:  All right. Danny, you've been talking with your lawyer now, have you
>                 not, for the last 25 minutes or so?
> DEFENDANT HILL:  Yeah.
> COURT:  And did he go over this matter of a jury trial with you?
> DEFENDANT HILL:  Yeah.
> COURT:  And you want to tell me now what decision you've made after talking
>                  this over.
> DEFENDANT HILL:  I want to have—
> COURT:  What do you want to do? Who do you want to try it? Three judges—
> DEFENDANT HILL:  Three judges.
> COURT:  —or do you want the jury?
> DEFENDANT HILL:  You.
> COURT:  I hope you understand—you mean myself and two other judges?
> DEFENDANT HILL:  (Nods head affirmatively.)

*Id*. At no point during the hearing did Hill behave in a manner, or make a statement indicating, that he did not understand the nature of the waiver.

---

**22**The transcript of the jury waiver hearing can be found in the district court record at R. 30 in *Hill v. Anderson*, No. 4:96-cv-00795 (N.D. Ohio Jan. 28. 1997).

On this record, there is no indication that Hill did not understand the nature of the proceedings against him or that he could not consult with defense counsel to assist in his case. *See Edwards*, 554 U.S. at 170. Although Hill is correct that the record suggests that he was functionally illiterate at the time of the suppression hearing, Hill cites no authority for the proposition that trial courts should equate illiteracy to incompetence. He also cites no authority for the proposition that because there were other signs that he was intellectually limited, i.e., his limited vocabulary or "ability to draw similarities," the trial court should have doubted his competence to stand trial and ordered a competency hearing *sua sponte*. As indicated above, the trial court had at least two opportunities to observe Hill and interact with him directly, and these incidents did not suggest that Hill was incompetent to stand trial under *Pate*, *Drope*, or the more recent Supreme Court case, *Edwards*.

For the aforementioned reasons, we **AFFIRM** the district court's denial of habeas relief as to Hill's due process claim.

## VIII. Conclusion

For the reasons articulated above, we **REVERSE** the district court's denial of habeas relief with regard to Hill's *Atkins* claim and we **REMAND** with instructions to grant the petition and to issue the writ of habeas corpus with respect to Hill's death sentence. We pretermit Hill's ineffective assistance of counsel claim based on *Atkins*, and **AFFIRM** the district court's denial of habeas relief with regard to his other three claims.